## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JM ADJUSTMENT SERVICES, LLC,
JIDUBEEBS, LLC, 44600 DELCO, LLC,
18 MILE PROPERTIES, LLC, KATFISH,      Case No. 16-_____-cv
L.L.C., NAJAH MANNI, KATHY MANNI;
JUSTIN MANNI, and STACEY              Hon.
ALEXANDER,

       Plaintiffs,

v.

J.P. MORGAN CHASE BANK, N.A.,
a national banking association.

       Defendant.
_____/

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Carl M. Levin (P16599)
Khalilah V. Spencer (P63933)
Attorneys for Plaintiffs
2290 First National Building
Detroit, MI  48226
(313) 465-7654

SCHLAM STONE & DOLAN LLP
Attorneys for Plaintiffs
26 Broadway
New York, NY 10004
(212) 344-5400
_____/

## **COMPLAINT**

Plaintiffs, Najah Manni, Kathy Manni, Justin Manni, Stacey Alexander (the individuals collectively "the Manni family"), Jidubeebs, LLC, JM Adjustment Services LLC, 44600 Delco, LLC, 18 Mile Properties, LLC and Katfish, L.L.C. by their attorneys, Honigman Miller Schwartz and Cohn LLP and Schlam Stone & Dolan LLP, for their Complaint against Defendant, J.P. Morgan Chase Bank, N.A. state:

## PARTIES, JURISDICTION AND VENUE

1.      Najah Manni is a U.S. citizen and resident of Nevada.  He was born in Baghdad, Iraq, immigrated to the United States as child and is of Chaldean and Arab ancestry.

2.      Kathy Manni is the wife of Najah Manni and a resident of Nevada.

3.      Justin Manni is the son of Najah and Kathy Manni and a resident of Michigan and is of Chaldean and Arab ancestry.

4.      Stacey Alexander is the daughter of Najah and Kathy Manni and a resident of Michigan and is of Chaldean and Arab ancestry.

5.      Jidubeebs, LLC ("Jidubeebs") is an Alaskan limited liability company wholly owned by the Manni family via five family trusts.

6.      JM Adjustment Services, LLC ("JMA") is a Michigan limited liability company wholly owned by Jidubeebs.   JMA is in the business of providing face-to-face borrower communications on behalf of lenders when the borrowers are

delinquent or in default on their loans or credit arrangements. Until the events complained of herein, JMA was a contractor for Defendant.

7. 44600 Delco, LLC ("Delco"), 18 Mile Properties, LLC ("18 Mile") and Katfish, L.L.C. ("Katfish") are all Michigan limited liability companies wholly owned by Jidubeebs.

8. Upon information and belief, J.P. Morgan Chase Bank, N.A. ("Defendant" or "Chase") is a national banking association with its main office in New York, New York.

9. This action arises, in part, under 42 U.S.C. § 1981.

10. In addition, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(a), 1343(3) and (4).

12. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

20862333.1

## GENERAL ALLEGATIONS

### THE PARTIES' BUSINESS RELATIONSHIPS

14.     Plaintiffs Najah and Kathy Manni along with their children, Justin Manni and Stacey Alexander have banked with Chase and its predecessors and affiliates of divisions, including J.P. Morgan Private Bank, for over 20 years, holding numerous banking accounts in their own names and those of their trusts and businesses.

15.     Najah Manni and his family have built JMA into a substantial and reputable company, representing many major corporations, including (until recently) Chase.  JMA now employs over 600 people.

16.     In addition, JMA and other corporate entities, owned by Mr. and Mrs. Manni and their family, including Jidubeebs, Delco, 18 Mile and Katfish held numerous long-standing business bank accounts with Chase and/or obtained loans or credit from Chase, which loans and credit were guaranteed by Mr. Manni and his family members and/or their trusts.

17.     Prior to the events described herein, JMA had been a service provider to Chase, for over 10 years.

18.     During that time, JMA provided "outreach services" for Chase, both under a services contract and pursuant to ad hoc requests from Chase, for various loss mitigation activities relating to various bank loans and mortgage financing.

4

20862333.1

19.    Following the financial crisis of 2008, JMA's work with Chase increased and became even more important, given federal regulations requiring banks to address issues relating to non-performing mortgages and borrowers.

20.    JMA fully performed its various contracted-for services, carried out its responsibilities well, and was recognized for the quality and integrity of its work.

21.    Chase representatives were well aware of the Manni family's Chaldean and Arab ancestry.

### CHASE UNILATERALLY CLOSES ALL OF PLAINTIFFS' BANK ACCOUNTS

22.    In early September of 2014, Najah Manni received a call from Jason Tinsley, an Executive Director of J.P. Morgan Private Bank whose office is located in Birmingham, Michigan.

23.    Najah Manni, who had enjoyed a warm and friendly relationship with Mr. Tinsley, was shocked to learn that Chase was abruptly severing its banking and lending relationship with Najah Manni and his family (including those of his adult children), including related corporate bank accounts, personal trust accounts, checking and savings accounts and lending and credit relationships.

24.    Mr. Tinsley did not provide any explanation, other than that his managers told him that there was no means of appeal or other avenue of relief.

20862333.1

25.     Mr. Tinsley told Najah Manni, however, that the adverse action taken by Chase's private bank group would not have any impact on JMA's business relationship with the Chase as a service provider.

26.     On or about September 4, 2014, the Manni family and related trust and corporate entities, received form letters advising them that Chase periodically reviews its existing client relationships to insure that its products and services "continue to be appropriate for, and well aligned with, our client's goals and objectives" and that Chase had unilaterally determined that Plaintiffs' interests "are no longer served by maintaining a relationship with J.P. Morgan Private Bank" and that Chase will end their current relationship.  (See September 4, 2014 Account Closure Letters attached collectively as Exhibit 1).

27.     Plaintiffs were further notified to arrange for the accounts to be transferred to another bank because the accounts would be closed on November 30, 2014.

28.     Najah and Kathy Manni's personal checking and savings accounts held with their daughter Stacey Alexander were closed by Chase as well as their certificate of deposit account along with their Line of Credit.

29.     The checking and savings accounts Stacey Alexander held with her husband were also closed by Chase.

20862333.1

30.    The checking and savings accounts that Justin Manni held with his wife were also closed by Chase.

31.    In addition, Jidubeebs' checking and savings accounts were also closed by Chase with a November 30, 2014 closure date as well JMA's eighteen checking accounts.  (See Exhibit 1).

32.    In addition, checking accounts and lending or credit relationships for (a) 18 Mile Properties LLC; (b) JK Racing Stable, LLC; (c) Katfish, LLC; (d) 1139 Opal Lake Drive , LLC; (e) 48303 Van Dyke, LLC; (f) Golf Run, LLC; (g) JM Serv-US, LLC; (h) Loon Resort, LLC; (i) NHM Management LLC; (j) The Lake Course, LLC; and (k) JM Technologies, LLC, all entities wholly owned by Jidubeebs and controlled by the Manni family were also closed by Chase. (See Exhibit 1).

33.    In addition, the Manni Family Foundation, Inc.'s checking accounts were also closed.  (See Exhibit 1).

34.    At the time of the bank's account closures, Plaintiffs collectively held over $5 million in deposits with Chase in various personal and corporate bank accounts.

35.    At the same time, Chase informed Plaintiffs that it would not extend term loans that it had previously provided to 44600 Delco, LLC, 18 Mile Properties, LLC and Katfish L.L.C.   Until the loans expired, and notwithstanding

7

Chase's preemptory decision to close the aforementioned banking accounts, Chase required certain Manni family members to maintain balances sufficient to collateralize the three term loans. (See Exhibit 1).

### CHASE TERMINATES JMA'S SERVICE CONTRACT

36.    Despite Mr. Tinsley's statement that JMA's service contract with Chase would be unaffected, shortly after his meeting with Mr. Tinsley, Najah Manni was notified that JMA's contract volume would be halved.

37.    This drastic reduction was explained by David Conley, Vice President for Chase as a directive from Chase's Third Party Oversight Group determining that Chase needed two vendors for "business resiliency."

38.    Later on June 5, 2015, David Conley told Najah Manni that he had received a directive from Chase's Third Party Oversight Group to terminate completely JMA's contract as a service provider for the Bank because he was a "reputational risk" to the Bank.

39.    However, contrary to Mr. Conley's explanation for the contract termination, Chase's own "Third Party Risk Assessment" for JMA dated May 20, 2015 (May 2015 Risk Assessment"), only two weeks before Mr. Conley's statement, found that JMA did not pose any reputational risk to the Chase.  (See May 2015 Risk Assessment Excerpt attached as Exhibit 2).

40.    Mr. Conley is listed as a recipient of the May 2015 Risk Assessment.

41.     Najah Manni and other JMA representatives have repeatedly asked for the basis of Mr. Conley's reputational risk statement, yet numerous bank representatives, have rebuffed them.

42.     In addition, a prominent international security and investigations firm hired by Plaintiffs' counsel could not find any basis for Chase to find that Najah Manni or JMA was a reputational risk to the bank.

43.     The September 4, 2014 manifestly false explanation for the closure of all of Plaintiffs' 30-plus bank accounts and the untrue and inconsistent statement in June 2015 that Najah Manni was a "reputational risk" to the bank were pretext for Chase's unlawful discrimination against Plaintiffs because of the Chaldean and Arab ancestry of Manni family members.

## COUNT I
## VIOLATION OF 42 U.S.C. § 1981

44.     Plaintiffs repeat and allege the allegations of Paragraphs 1 - 43 as if fully set forth herein.

45.     42 U.S.C. § 1981 prohibits racial and ethnic discrimination in contract transactions.

46.     Chase representatives were well aware of the Manni family members' Chaldean and Arab ancestry.

47.     During the same time period, other Chaldean-Americans or Arab-Americans made similar discrimination complaints against Chase.   See Exhibit 3.

9

20862333.1

48.     By unilaterally closing Plaintiffs' bank accounts and cancelling JMA's contract because of the Manni family members' Chaldean and Arab racial and ethnic background, Chase violated 42 U.S.C. § 1981.

49.     As result of Chase's unlawful discrimination, Plaintiffs have suffered substantial injury, including compensatory damages for reputational harm and emotional distress.

## COUNT II
### VIOLATION OF MICHIGAN'S ELLIOT-LARSEN CIVIL RIGHTS ACT

50.     Plaintiffs repeat and allege the allegations of Paragraphs 1 - 49 as if fully set forth herein

51.     Michigan's Elliot-Larsen Civil Rights Act prohibits the denial of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status" by a business. Mich. Comp. Laws §§ 37.2301 and 37.2302(a) (2015).

52.     Chase representatives were well aware of the Manni family's Chaldean and Arab ancestry.

53.     In unilaterally closing Plaintiffs' bank accounts and cancelling JMA's contract because of the Manni family members' Chaldean and Arab racial and

ethnic background, Chase violated Michigan's Elliott-Larsen Civil Rights Act, which prohibits such discrimination in public accommodation.

54.     As result of Chase's unlawful discrimination, Plaintiffs have suffered substantial injury, including compensatory damages for reputational harm and emotional distress.

## COUNT III
### VIOLATION OF 15 U.S.C. § 1691E
### (THE EQUAL CREDIT OPPORTUNITY ACT) ON BEHALF OF NAJAH AND KATHY MANNI AND JIDUBEEBS

55.     Plaintiffs repeat and allege the allegations of Paragraphs 1 - 54 as if fully set forth herein.

56.     The following Plaintiffs were applicants for credit from Chase as defined in the Equal Credit Opportunity Act (the "ECOA"), 15 U.S.C. § 1691a(b) and Section 1002.2(b) of Regulation B of the Consumer Finance Protection Bureau, 12 CFR § 1002.2(b): Najah Manni and Kathy Manni, Jidubeebs, JMA, 44600 Delco, 18 Mile Properties and Katfish (collectively, the "Applicants).

57.     Chase was at all relevant times a creditor as defined in the ECOA and implementing regulations.

58.     Each of the Applicants is controlled by, or is beneficially held by or for the benefits of a person of Chaldean and Arab ancestry and such racial status and ethnicity was known to Chase and its employees.

20862333.1

2:16-cv-10630-SFC-RSW   Doc # 1   Filed 02/19/16   Pg 12 of 17   Pg ID 12

59.   On or about September 4, 2014, Chase, in violation of Section 1691(a)(1) of the ECOA and the corresponding regulations, took adverse actions with respect to the Applicants' credit transactions which actions were discriminatory against the Applicants on the basis of their race and/or national origin or on the basis of such attributes of the trustees, beneficiaries or controlling members of such Applicants.  (See Exhibit 1).

60.   Applicants were not in default of any of their credit transactions with Chase when Chase took its adverse actions, which transactions were profitable for Chase.  Chase stated a transparently disingenuous and manifestly false reason for the adverse credit transactions by stating that Applicants' "interests are no longer served by maintaining a relationship with the J.P. Morgan Private Bank."

61.   Chase's lack of a plausible reason for terminating the Applicants' credit transactions and other banking relationships with Plaintiffs and the manifest arbitrariness of such terminations in light of the ordinary business of Chase and the profitability that would inure to Chase of continuing such transactions, are not the only reasons why the Applicants allege that Chase has discriminated against them in violation of the ECOA and its implementing regulations.

62.   On or about June 5, 2015, Najah Manni was told by David Conley, Vice President for Chase that persons in the Chase's "Third Party Oversight Group" arm had labeled Mr. Manni as a "reputational risk" to Chase.

20862333.1

63.     The characterization is patently false with respect to Mr. Manni and the other Plaintiffs as evidenced in part by their over 20-year banking relationship with Chase.  Plaintiffs have no history of any impropriety.

64.     Moreover, contrary to Mr. Conley's explanation for the contract termination, Chase's own "Third Party Risk Assessment" for JMA dated May 20, 2015 (May 2015 Risk Assessment"), only two weeks before Mr. Conley's statement, found that JMA did not pose any reputational risk to the Chase and specifically reported "no exceptions noted" under the "Reputational Risk" category.  (See May 2015 Risk Assessment Excerpt attached as Exhibit 2).

65.     Plaintiffs also commissioned their own background investigation, which revealed no information that could have led Chase to reasonably believe that the Applicants or any of the other Plaintiffs constituted a reputational risk to the bank.

66.     Upon information and belief, Chase is using the term "reputational risk" as pretext for race and/or ethnic- based discrimination against the Applicants.

67.     At or around the same time that Chase took adverse action with respect to the Applicants' credit transactions, other Chaldean-Americans and Arab-Americans made similar discrimination complaints against Chase.

20862333.1

68.    As result of Chase's unlawful discrimination and violation of the ECOA, Plaintiffs have suffered substantial injury, including compensatory damages for reputational harm and emotional distress.

## COUNT IV
### FOR DEFAMATION ON BEHALF OF NAJAH MANNI

69.    Plaintiff Najah Manni repeats and alleges the allegations of Paragraphs 1 - 68 as if fully set forth herein.

70.    Plaintiff Najah Manni is a co-founder and manager and publicly recognized representative of JMA.

71.    JMA is in the business of providing face-to-face borrower communications on behalf of lenders, such as banks, when the borrowers are delinquent or in default on their loans or credit arrangements.

72.    JMA had been a provider of such services to Defendant for 10 years prior to Chase's termination of the relationship in July 2015.   As of the termination, Defendant and JMA were parties to (a) a Master Agreement effective November 1, 2011; (b) a Services Schedule Agreement effective June 1, 2012 and (c) and an Amendment to the Services Schedule Agreement effective October 1, 2014.   Mr. Manni as its manager signed each document on behalf of JMA.

73.    JMA at all times performed properly under the above agreements and was not in material breach thereof.   In its own May 20, 2015 Risk Assessment of

20862333.1

JMA, Chase noted "no exceptions" to the key category of "Reputational Risk". (See May 2015 Risk Assessment Excerpt attached as Exhibit 2).

74.     However, on or about June 5, 2015, Mr. Manni learned that persons in Chase's "Third Party Oversight Group" had published to David Conley and other Chase employees that Mr. Manni posed a "reputational risk" to Chase and that the "Third Party Oversight Group" was therefore directing David Conley to terminate the relationship with JMA.

75.     The statement that Mr. Manni was a reputational risk to the bank was patently false as evidenced in part by his over 20-year banking relationship with Chase.  Mr. Manni also has no history of any impropriety.

76.      Plaintiffs commissioned their own background investigation, which revealed no information that could have led Chase to reasonably believe that Najah Manni constituted a reputational risk to the bank.

77.     Chase employees knew the statement was false and/or had reckless disregard for the falsity of the statement that Najah Manni was a reputational risk to the bank.

78.     The false statement that Najah Manni was a reputational risk for Chase were a direct and proximate cause of Chase's termination of JMA's contract and damaged Mr. Manni's business and reputation.  Indeed, but for the defamation,

it is likely that JMA would have been able to profit from its contractual relationship with Chase for years to come.

79.     As result of Chase's defamation, Mr. Manni has suffered substantial injury, including compensatory damages for reputational harm and emotional distress.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Enter judgment in Plaintiffs' favor and against Chase in the amount of compensatory and punitive damages, reasonable attorney's fees and costs; and

B.     Grant Plaintiffs such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby request a jury trial on all counts pursuant to Rule 38 of the Federal Rules of Civil Procedure.

20862333.1

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for Plaintiffs

By:   /s/ Khalilah V. Spencer
     Carl M. Levin (P16599)
     Khalilah V. Spencer (P63933)
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226
(313) 465-7000

SCHLAM STONE & DOLAN LLP
26 Broadway
New York, NY 10004
(212) 344-5400

Dated:  February 19, 2016

17