UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JM Adjustment Services, LLC, et al.,

     Plaintiffs,

v.                           Case No. 16-10630

J.P. Morgan Chase Bank, N.A.,     Sean F. Cox
                                     United States District Court Judge

     Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs–the Manni family and their assorted companies–allege that Defendant J.P. Morgan Chase Bank, N.A. discriminated against them when it improperly closed their bank accounts and terminated a service contract. Plaintiff Najah Manni also asserts a defamation claim. Discovery has concluded and Chase has moved for summary judgment.

For the reasons below, the Court shall grant the Motion for Summary Judgment. For the discrimination claims, the Court concludes that Plaintiffs have failed to show a prima facie case and, even if they had, that they have failed to show pretext. For the defamation claim, the Court concludes that the relevant statements were protected by qualified privilege.

## BACKGROUND

This case involves numerous individual and corporate plaintiffs. The former is the Manni family: Najah Manni (also known as John), his wife Kathy Manni, and their adult children Justin Manni and Stacey Alexander. The latter is several limited liability companies–JM Adjustment Services, LLC, Jidubeebs, LLC, 44600 Delco, LLC, 18 Mile Properties, LLC, and Katfish,

LLC–that are all directly or indirectly owned by the family. Def. Stmt. of Undisputed Facts, ¶¶ 2, 6-8. Najah Manni and his children are of Arab and Chaldean descent. *Id*. at ¶ 3.

The Manni family used to have an extensive relationship–individually and through their companies–with Defendant J.P. Morgan Chase Bank, N.A. The Manni family held and were authorized signatories on a deposit account and savings account. *Id*. at ¶¶ 9-10. JM Adjustment also held two deposit accounts with Chase, on which Najah, Kathy, and Justin were authorized signatories. *Id*. at ¶¶ 11-12. All of the bank accounts were subject to written agreements authorizing either Chase or Plaintiffs to close the accounts at any time upon notice to the other. *Id*. at ¶ 13. JM Adjustment also had a vendor relationship with Chase, performing customer-outreach services. *Id*. at ¶ 18. The governing Master Services Agreement between the two provided that Chase could terminate the agreement at any time by giving JM Adjustment at least 30 days' prior written notice. *Id*. at ¶ 20. Finally, several of the other Plaintiff-companies had term loans with Chase, some of which had liquidity covenants requiring an amount to be held with Chase in the name of the company or the loan's guarantors. *Id*. at ¶¶ 14-17.

Before discussing the deterioration of the relationship between Chase and the Mannis, some context is required. First, under the Bank Secrecy Act, financial institutions like Chase must file a Currency Transaction Report when a customer's currency transactions exceed $10,000 in a single day. 31 C.F.R. § 1010.311. Conducting or attempting to conduct currency transactions for the purpose of evading these reporting requirements is known as "structuring," which is a federal crime. 31 C.F.R. § 1010.100(xx); 31 U.S.C. § 5324(a)(1), (3). Financial institutions face legal, regulatory, compliance, and reputation risk if they fail to monitor or respond to potential structuring activity. Def. Stmt. at ¶ 23. For these reasons, Chase monitors

customer transactions for the appearance of structuring. *Id*. at ¶¶ 24-25, 28.

Second, related to this monitoring is Chase's active management of its reputational risk, that is, the risk that certain conduct will reduce trust in Chase's integrity or competence. *Id*. at ¶ 30. Chase has policies designed to identify potential reputational risk, to communicate within and across its lines of business, and to ensure consistent approaches to risk management. *Id*. at ¶ 31. Chase's Private Bank has a Reputation Risk Committee, which assesses whether to retain or terminate relationships with Private Bank clients whose banking activities pose potential risk to Chase (such as by structuring transactions). *Id*. at ¶ 32. Similarly, the Mortgage Bank has a Third Party Oversight group that reviews potential reputational risk from Mortgage Bank vendors. *Id*. at ¶ 33. This potential risk may also be reviewed by a risk committee, which considers whether to continue or terminate a vendor relationship based on that risk. *Id*. at ¶ 34.

These policies are relevant to the dispute here, whose origins date back to 2007. From August to October 2007, six cash withdrawals of $9,900 were made from one of JM Adjustment's accounts. *Id*. at ¶ 40. In response to this pattern of transactions under $10,000, Chase sent a letter to JM Adjustment, addressed to "Mr. Manni", stating that the transactions could be viewed as an attempt to avoid reporting requirements. Def. Ex. 43, 45. Chase advised Manni to change his transaction patterns and suggested that his accounts could be closed if the pattern of cash activity did not change. Def. Ex. 45. Although neither Justin Manni or Najah Manni recall receiving this letter, J. Manni Dep, p. 132-33; N. Manni Dep., p. 118-19, Chase's records reflect that a Chase employee spoke with Najah Manni the day the letter was sent. Def. Ex. 43. Manni indicated that the reason he withdrew the money in that way was because the branch did not have enough cash and withdrawal in that amount was more convenient. Def. Ex.

43. He agreed to discontinue withdrawing money in that manner and the Chase employee advised him that a letter would be sent regarding the discussion. *Id*. After this discussion occurred, Chase's records do not reflect any alerts for possible structuring activity for the next two years. *See id*.

In September 2009, five different cash withdrawals of $9,900 from August triggered an alert on Chase's automated monitoring system. Def. Stmt., ¶ 45. In December, six more withdrawals of $9,900 from November also triggered an alert. *Id*. at ¶ 46. A Chase compliance officer reviewed the activity and noted that a "structuring warning letter" would be sent. *Id*. at ¶ 47. In January 2010, Chase sent a letter to John Manni c/o JM Adjustment, again stating that the pattern of cash transactions could be viewed as an attempt to avoid reporting requirements and advising a change in transaction patterns. Def. Ex. 43, 46. Justin Manni and Najah Manni do not recall receiving this letter and Chase did not receive a response. J.Manni Dep., p. 134-36; N. Manni Dep., 118-19; Def. Ex. 43.

On several occasions in 2010, one of Chase's compliance officers reviewed transaction activity on one of JM Adjustment's accounts and noted multiple withdrawals ranging from $8,000 to $9,900. Def. Stmt., ¶ 51. In August 2010, five different cash withdrawals of either $8,000 or $9,000 were made *Id*. at ¶ 52. Four months later, Kathleen Gruszczyk, an executive director in the Private Bank's Incident & Client Advisory Group, expressed concern in emails to other Chase employees that JM Adjustment was structuring. Pl. Ex. 5. She indicated that a bank manager would meet with Najah Manni to explain the reporting requirements and that he would be given one more chance to change his behavior. *Id*. Gruszczyk also reported that if the behavior did not change, JM Adjustment's banking relationship could be terminated. *Id*.

In light of this, compliance officer Valerie Mangan directed Area Manager Stephen Ball to communicate Chase's concerns to Najah Manni, convince him to change his transaction activity, remind him that a structuring warning letter had been sent, and explain that the bank would immediately close his accounts in response to future structuring. Def. Stmt., ¶ 54. Ball did so, and Manni reported that the withdrawals were primarily reimbursement for business expenses, that he was not attempting to structure, and that his branch regularly lacked the amount of large bills he required. Def. Ex. 48. Manni stated that he was simply accommodating the branch and that he was aware of the need to fill out a large currency transaction report for amounts over $10,000. Def. Ex. 53. The local branch manager verified Manni's story. *Id.*

Following this conversation, Plaintiffs' relationships with Chase continued. In mid-2011, Manni requested that JM Adjustment's business accounts, which were split between Business Banking and the Private Bank, be transferred to the Private Bank to consolidate the accounts into one line of business. Def. Ex. 53; Tinsley Dep., p. 65. Marketing Manager Michael Robinson reviewed the request. Def. Ex. 53. He noted the structuring issues dating back to 2007 and that, since Ball's discussion with Manni, there had been no further instances of structuring. *Id.* He recommended approving the line of business transfer with the criteria that one more instance of structuring would require closure of the account. *Id.* JM Adjustment's accounts were then transferred to the Private Bank, where they became Jason Tinsley's clients. Tinsley Dep., p. 65.

In August 2011, Gruszczyk emailed Tinsley, informing him that "due to the numerous occasions of his cash structuring with his businesses, Manni was told one more cash event and he will be exited." Def. Ex. 50. She advised that this directive would have to be honored, otherwise Chase would be vulnerable to regulatory issues. *Id.* In emails, Robinson and Tinsley

also indicated that Chase would not have any tolerance if Manni began to structure again. Def. Ex. 51. For the next two years, Plaintiffs' relationships with Chase continued without issue and Chase raised no concerns about structuring. *See* Def. Ex. 57.

In February 2014, Private Bank risk officer Melanie Napoleon requested that Manni provide additional information about six different 2013 withdrawals in which he withdrew amounts ranging from $10,000 to $50,000. Def. Ex. 58. One month later, Napoleon sent Gruszczyk and Tinsley an email with a report of Manni's cash transactions between April 2013 and November 2013. Def. Ex. 59. The report reflected that Manni had made ten withdrawals of between $9,000 and $9,900 and nine withdrawals in excess of $10,000 during that time. *Id*. The report erroneously included three transactions below $10,000 while omitting several above $10,000. Tinsley Dep., p. 108-114. Some of the transactions during this time frame had also been reviewed by an unnamed Chase employee in November 2013. Pl. Ex. 19. The employee noted that Manni had been advised in 2010 that withdrawals below $10,000 needed to stop, that it appeared the activity had ceased, and that transactions indicated Manni was doing construction in Nevada. *Id*.

Based on Napoleon's report, Gruszczyk believed that the listed transactions reflected the possibility of cash structuring. Gruszczyk Dep., p. 180-81. Citing suspicious transactions, she made a reputation risk issue submission about Najah Manni to the Private Bank Reputation Risk Committee. Def. Ex. 60. The submission stated that Manni had been exited from Business Banking due to cash structuring, that he and his business had alerted seven times between 2007 and 2010, and that he was currently structuring. *Id*. The submission included the same cash transaction report that had been included in Napoleon's email to Gruszczyk. *Id*.; Def. Ex. 59.

The Committee discussed Gruszczyk's submission at a March 2014 meeting. Def. Stmt., ¶ 62. It also discussed the large amount of cash used by Plaintiffs. *Id*. at ¶ 64. The Committee's notes indicate that it believed that a "[s]tructuring pattern is evident" and that "[g]iven history we probably need to exit." *Id*. at ¶ 63. The Committee decided to notify the Mortgage Bank of the Private Bank's predisposition to exit Plaintiffs' banking relationship. *Id*. at ¶ 65.

Two months later, the Private Bank Reputation Risk Committee again discussed the Bank's relationship with Manni. *Id*. at ¶ 67. At this time, the Mortgage Bank was informed that the Private Bank was considering exiting Manni's banking relationship due to structuring–a reputational risk concern. Def. Ex. 69; Def. Ex. 70. The Mortgage Bank indicated that if Manni was being exited for a regulatory reason, it would not feel comfortable using him as a vendor. Def. Ex. 70. Heidi Carter, a Mortgage Bank executive, was asked to evaluate the potential effect of the termination of JM Adjustment's vendor contract. Def. Stmt. at ¶ 73. After the meeting, the Committee's decision on the relationship remained pending, with a predisposition to exit, pending further communication from the Mortgage Bank. *Id*.; Def. Stmt., ¶ 67.

In July 2014, the Committee formally decided to exit Manni's relationship based on his large cash transactions and structuring history. Def. Stmt., ¶ 68; Pl. Ex. 41. In September, Chase notified Plaintiffs that it would be closing most of their accounts in November, with the exception of certain accounts that would remain open to fulfill liquidity covenants on term loans held by 44600 Delco, 18 Mile, and Katfish. *Id*. at ¶¶ 70-71. Around this time, the Mortgage Bank also began to transition away from its relationship with JM Adjustment, splitting its business between the company and an alternate vendor. *Id*. at ¶ 74. But Tinsley also informed Najah Manni that the Private Bank's actions would not effect JM Adjustment's business

relationship with Chase. N. Manni Dep., p. 200.

Despite Tinsley's representation, the Mortgage Bank eventually decided to terminate JM Adjustment's vendor contract because of the potential regulatory effects from continuing to use JM Adjustment as a vendor. Def Stmt., ¶ 75. In June 2015, David Conley, who was then responsible for managing Chase's vendor relationship with JM Adjustment, informed Najah Manni that Chase had decided to terminate the vendor contract. *Id*. at ¶ 78; Conley Dep., p. 140. During this conversation, Conley told Manni that he received a call from third-party oversight stating that Manni and his company were a reputational risk. N. Manni Dep., p. 68.

After the termination of their banking and vendor relationships, Plaintiffs filed this lawsuit against Chase, alleging that Chase violated (1) 42 U.S.C. § 1981; (2) Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2301, *et seq.*, and (3) the Equal Credit Opportunity Act, 15 U.S.C. § 1691e (Doc. # 1). Najah Manni also brought a defamation claim based on the statement that he was a reputational risk to the bank. After discovery, Chase moved for summary judgment (Doc. # 52) and Plaintiffs have responded (Doc. # 62).

## STANDARD

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

## ANALYSIS

## I. The Discrimination Claims

Plaintiffs assert that Chase's decision to close their accounts and terminate JM Adjustment's contract was discriminatory and violated 42 U.S.C. § 1981, the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2302(a), and the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a). Section 1981 prohibits racial discrimination in making and enforcing contracts. *McCormick v. Miami Univ.*, 693 F.3d 654, 659 (6th Cir. 2012). To establish a racial discrimination claim under § 1981, a plaintiff "must possess some contractual right that the defendant blocked or impaired" and demonstrate that racial discrimination motivated that impairment. *See Williams v. Richland County Children Servs.*, 489 F. App'x 848, 851 (6th Cir. 2012).

The familiar burden-shifting standard of proof from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to § 1981 claims. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001). First, Plaintiffs must establish a prima facie case of discrimination by a preponderance of the evidence. *Id.* "The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Id.* If provided, Plaintiffs must prove by a preponderance of the evidence that Chase's proffered reason is a pretext for discrimination. *Id.* The parties agree that the Elliott-Larsen and Equal Credit Opportunity Act claims are also analyzed under this same framework. *See Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634, 639 n. 1 (6th Cir. 2009) (Elliott-Larsen); *Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873, 880 (6th Cir. 2002) (Equal Credit Opportunity Act).

## A. Prima Facie Case

The Court's inquiry begins with whether Plaintiffs have established a prima facie case of

discrimination. The parties agree that to make out a prima facie case, Plaintiffs must prove: (1) membership in a protected class; (2) that they "sought to make or enforce a contract for services ordinarily provided by the defendant"; and (3) that they were "denied the right to enter into or enjoy the benefits or privileges of the contractual relationship" because they "received services in a markedly hostile manner and in a manner in which a reasonable person would find objectively discriminatory."[1] *Christian*, 252 F.3d at 872.

For the first element, there is no dispute that Najah Manni and his children are of Arab and Chaldean descent and are members of a protected class. *See, e.g., Zebari v. Pepsi Bottling Co.*, 2007 WL 1041199 at * 8 (E.D. Mich. 2007); *Eid v. Saint-Gobain Abrasives, Inc.*, 2007 WL 4373948 at * 6 (E.D. Mich. 2007). Kathy Manni and the Plaintiff-companies also meet the first element by virtue of their association with Najah and his children. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) ("Section 1981 also prohibits discrimination based on association with or advocacy for non-whites . . . ."). Chase has offered no reason why this association is insufficient to satisfy the first element of Plaintiffs' prima facie case.

There is also no dispute that Plaintiffs have satisfied the second element. Plaintiffs sought to make and enforce contractual services with Chase, including personal bank accounts, credit facilities, and the vendor contract with JM Adjustment.

Instead, this case centers around the third element, particularly as to whether Plaintiffs can establish that they were treated in a "markedly hostile manner" that "a reasonable person

---

[1] A plaintiff may also prove the third prong of the prima facie case by showing that he was "deprived of services while similarly situated persons outside the protected class were not." *Christian*, 252 F.3d at 872. Plaintiffs have not offered such proof here and do not seek to prove their prima facie case in this manner.

would find objectively discriminatory." *Christian*, 252 F.3d at 871. To determine whether

Chase's conduct was "markedly hostile," the Court should consider whether it was: "(1) so

profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2)

so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the

conduct supports a rational inference of discrimination." *Keck*, 566 F.3d at 641 (quotation

omitted).

Chase's decision to close Plaintiffs' accounts was undoubtedly against its financial

interests. *See Wheat v. Chase Bank*, 2014 WL 457588 at * 18 (S.D. Ohio 2014) (holding that the

abrupt closing of two bank accounts was "profoundly contrary" to the defendant's manifest

financial interests). By closing the accounts, Chase deprived itself "of all future profits to be

earned from [Plaintiffs'] substantial deposit, such as interest from lending or fees incurred in

investment transactions." *Id*. The abrupt cancellation of Plaintiffs' substantial accounts also

risked reputational damage to Chase, which can have a detrimental financial impact. *Id*.

But it is not enough for the decision to have a negative financial impact on Chase.

Instead, the decision must have been *profoundly* contrary to Chase's manifest financial interests.

Not so here. Financial institutions that fail to implement effective anti-money laundering

programs or fail to identify and respond to potential structuring can face severe civil, regulatory,

and criminal penalties. Def. Ex. 135, p. 8-9. These penalties, and any corresponding damage to

the institution's reputation, also affect the institution's financial interests.[2] And the record

reflects that Chase had concerns about Plaintiffs' possible structuring for years before the exit, to

the point that numerous documents reflect that Chase had determined that one more incident of

---

[2] These concerns, which were not present in *Wheat*, render that case distinguishable.

cash structuring would result in it terminating its relationship with Najah Manni. In the face of these reputational risk concerns, Chase's eventual decision to exit its relationship with Plaintiffs was not profoundly contrary to its manifest financial interests, despite any lost profits.

Chase's decision was also not "so far outside of widely-accepted business norms" as to support a rational inference of discrimination. The record undisputedly reflects that Chase repeatedly articulated concerns about Plaintiffs' possible structuring and, after 2011, drew a line in the sand against any further incidents. Then, in 2014, Gruszczyk identified transactions that she believed to be structured and that posed a reputational risk to Chase. After reviewing Plaintiffs' transactional history, which showed apparent structuring and significant cash withdrawals, Chase's Reputational Risk Committee decided to exit the relationship due to the reputational risk involved. Because of the potential penalties faced if the transactions indeed ran afoul of anti-money laundering rules and regulations, Chase's response to its reputational risk concerns, even if prophylactic, was reasonably within accepted business norms. And Plaintiffs have not identified how Chase's decision, or the underlying process, nevertheless strayed far afield from "widely-accepted business norms." *Cf. Keck*, 566 F.3d at 641 (holding a hotel's failure to sign a wedding contract with the plaintiffs, despite their numerous attempts to book an open date, was outside of widely accepted business norms).

Plaintiffs have also not shown that Chase's conduct was "so arbitrary on its face" as to support a rational inference of discrimination. Chase's decision was not baseless. It stemmed from concerns about structuring, which were expressed repeatedly to Plaintiffs, and Plaintiffs' excessive cash withdrawals. Plaintiffs challenge this justification, alleging that Chase's decision to exit their relationships was inconsistent with its demand that they keep certain accounts open

per liquidity covenants.[3] But the latter decision was hardly arbitrary–Chase could reasonably decide to retain the bank accounts that provided collateral for outstanding loans to Plaintiffs even as it terminated its other banking and vendor relationships with them.

Nor is any indication of arbitrariness apparent in the decisional process itself. When concerns arose in 2014 about potential structuring and Plaintiffs' numerous large cash withdrawals, Chase promptly initiated its standard procedure to evaluate its relationship with Plaintiffs and their potential reputational risk to the bank. The Reputational Risk Committee met several times and both banks that had relationships with Plaintiffs–the Private Bank and the Mortgage Bank–communicated about their concerns. This procedure was not irregular and Plaintiffs do not allege otherwise. Thus, Chase's decision was not "so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Keck*, 566 F.3d at 641.

Finally, under *Christian*, Plaintiffs must show that they were treated in a "markedly hostile manner *and* in a manner in which a reasonable person would find objectively discriminatory." *Christian*, 252 F.3d at 872 (emphasis added). As the Second Circuit has held when applying this same test, "[a]lthough mistreatment by defendants is not irrelevant in assessing the strength of plaintiffs' circumstantial evidence of race-based animus, it is certainly not sufficient to establish it." *Lizardo v. Denny's Inc.*, 270 F.3d 94, 102 (2d Cir. 2001). There

---

[3] Plaintiffs also contend that "another Chase department chose to extend another million dollar-plus loan to Plaintiffs for JMA's headquarters months after [the Reputational Risk Committee] decided to close Plaintiffs' bank accounts." Pl. Br., p. 14. But Plaintiffs provide no record support for this assertion, citing only to the statement of facts and counter-statement of facts, neither of which make this assertion. And it is not the Court's duty to scour the record to verify Plaintiffs' unsupported claim. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

may be many circumstances in which even markedly hostile treatment raises no inference of racial animus. *See id*. Here, not only is there no evidence in the record of any racially charged conduct whatsoever, but Plaintiffs' cited instances of hostility, considered in context, also fail to support any "inference of discriminatory intent." *Id*. Under the circumstances, a reasonable person could not find that Chase's conduct was objectively discriminatory.

In sum, even when viewing the facts in the light most favorable to Plaintiffs, they have not shown that Chase's conduct was "markedly hostile." Plaintiffs have failed to show that Chase's actions were profoundly contrary to its manifest financial interests, outside of widely-accepted business norms, or so facially arbitrary that its actions support a rational inference of discrimination. A reasonable person also could not find Chase's conduct discriminatory as it does not support an inference of discriminatory intent. Thus, because Plaintiffs have failed to establish a prima facie case of discrimination, Chase is entitled to summary judgment.

## B. Pretext

What's more, even if Plaintiffs could establish a prima facie case, they cannot show that Chase's legitimate, non-discriminatory reason for its actions–that it terminated its relationships with Plaintiffs due to reputational risk concerns from Plaintiffs' apparent structuring–was a pretext for discrimination. A plaintiff can demonstrate pretext by showing that the proffered reason "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *O'Donnell v. Cleveland*, 838 F.3d 718, 727 (6th Cir. 2016). Here, Plaintiffs unsuccessfully attempt to show pretext through the first two methods.

To show that Chase's proffered reason had no basis in fact, Plaintiffs must show that the

reason is "factually false." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). But Plaintiffs cannot merely dispute the underlying facts. They must also show that Chase did not "honestly believe" in its proffered non-discriminatory reason. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

There is no question that Chase's proffered reason has a factual basis. Chase had concerns about Plaintiffs' possible structuring dating back to 2011, so much so that it repeatedly noted that one more instance would result in closure of Plaintiffs' accounts. And there were multiple transactions in 2013–such as three $9,500 withdrawals in September–that gave the appearance of structuring. These withdrawals prompted Chase's investigation into whether Plaintiffs were a reputational risk. As the record repeatedly reflects, these withdrawals, alongside Chase's prior concerns, led to the determination that Plaintiffs' were a reputational risk and the subsequent decision by the Private Bank and the Mortgage Bank to exit the relationships.

In response, Plaintiffs contend that they were not structuring and that any allegation that they were is false. They also note that Najah Manni willingly changed his behavior after being approached about structuring in 2011. But even taking these contentions as true, as the Court must, does not establish pretext. The relevant question is not whether Plaintiffs were in fact structuring, but whether Chase honestly believed them to be. And in this case Plaintiffs have not put forth sufficient evidence to overcome the honest-belief rule. *Braithwaite*, 258 F.3d at 494.

"An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (quotation marks omitted). Here, the

particularized facts are undisputed; Plaintiffs had several cash withdrawals that gave rise to suspicion of structuring. And Chase's position on the matter was quite clear; it had determined that one more instance would be fatal to the Private Bank's relationship with Plaintiffs. This determination–in light of Chase's stringent anti-money laundering obligations–was not unreasonable. Nor was Chase's decision to follow through and do exactly what it had promised when another instance was identified.

Plaintiffs argue that Chase's decision was still unreasonable because Chase ignored their numerous transactions in excess of $10,000. But Chase's decision to end the relationships did not ignore this fact; it was based on structuring *and* excessive cash transactions. And a customer can still attempt to evade reporting requirements even while complying with those requirements in other instance. Chase's decision was also not made in a vacuum; it had already established a zero-tolerance stance on any additional transactions raising the suspicion of structuring.

Plaintiffs also criticize Chase's decisional process, noting that the report that sparked the review erroneously included transactions under $10,000 while omitting many in excess of that amount. But the law does not require Chase's decisional process to "be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). That Chase's process was imperfect, or that it should have considered more facts, does not compel the conclusion that Chase did not reasonably rely on the particular facts before it. And Plaintiffs have not identified any evidence showing that Chase's process was "irregular or idiosyncratic." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009). Evidence that a non-decision-maker may have considered the 2013 transactions and deemed them not to be structured also does not show that Chase's decision was unreasonable. *See id*. at 560. Thus, Plaintiffs have

not met their burden to overcome Chase's invocation of the honest belief rule and to show that Chase's proffered justification has no basis in fact.

Alternatively, Plaintiffs also argue that they can show pretext because Chase's proffered justification was not the actual reasons for the termination of their banking and vendor relationships. To establish this, they must show circumstances tending to prove that an illegal motivation was more likely than the proffered reason. *Manzer*, 29 F.3d at 1084.

Plaintiffs contend that they have carried their burden because Chase's justifications for the exit have shifted over time. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."). They note, correctly, that although Chase's internal documents state that structuring and excessive cash were the reasons for the exit, Chase's motion for summary judgment only addresses structuring. But unlike *Cicero*, in which the employer's justifications repeatedly changed, *see id.*, Chase has consistently expressed concerns about Plaintiffs possible structuring. And it has consistently cited structuring as a reason for its exit, from when the decision was made through the proceedings in this Court. That Chase did not address its second reason for the exit–excessive cash–in its motion for summary judgment does not warrant the conclusion that first reason–structuring–was a falsity.

Plaintiffs also rely on reports of Chase discriminating against other Arab and Muslim customers during the same time period as this case. To the extent they are attempting to assert a pattern-or-practice claim, this method is inappropriate for proving discrimination in an individual case. *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004). And although evidence of other acts of discrimination can be relevant to show pretext, *see Griffin v.*

*Finkbeiner*, 689 F.3d 584, 598 (6th Cir. 2012), Plaintiffs have not shown how the unrelated reports of banking discrimination that it relies upon are relevant to this case. *See Spring/United Mgt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008) (holding that the question of whether evidence of other acts of discrimination "is relevant is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."). There is no evidence that the other instances involved similar circumstances, that Chase's decision-makers here were aware of the other instances, or that the other complaints involved similarly-situated customers. *See Griffin*, 689 F.3d at 599.

In sum, along with their failure to establish a prima facie case, Plaintiffs have also not met their burden to show that Chase's proffered justification was pretextual. They have not shown that the decision to terminate their relationships due to structuring had no basis in fact or was not the actual reason for the end of their relationships. Thus, the Court shall grant Chase's Motion for Summary Judgment on Plaintiffs' discrimination claims.

## II. Defamation Claim

Chase has also moved for summary judgment on Najah Manni's defamation claim. To establish a claim for defamation, Manni must show: (1) a false and defamatory statement concerning him, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Thomas M. Cooley Law Sch. v. Doe 1*, 300 Mich. App. 245, 262 (2013). In the complaint, Manni alleged defamation based on a statement by an unknown individual to David Conley that he was a reputational risk. Now, for the first time in his response to Chase's Motion for Summary

Judgment, Manni now also alleges that Gruszczyk's statements that he was structuring were defamatory. The Court shall address each allegation in turn.

## A. Reputational Risk

Manni's complaint alleges one defamatory statement; the statement of an unknown Chase employee to Conley that Manni posed a "reputational risk" to Chase. But, as explained below, Manni cannot prevail on this claim because the statement is protected by qualified privilege.

In Michigan, qualified privilege applies when the defendant shows "(1) good faith, (2) an interest to be upheld, (3) a statement limited in scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Elias v. Fed. Home Loan Mortg. Corp.*, 581 F. App'x 461, 467 (6th Cir. 2014). It "extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty." *Bacon v. Mich. Cent. R. Co.*, 33 N.W. 181, 183 (Mich. 1887). But this privilege "can be overcome if the defendant acted with actual malice, meaning with knowledge of the statement's falsity or with reckless disregard for the truth." *Elias*, 581 F. App'x at 467.

A typical example of qualified privilege can be found in the employment context. Employers have a qualified privilege "to defame an employee by making statements to other employees whose duties interest them in the subject matter." *Whiting v. Allstate Ins. Co.*, 433 F. App'x 395, 398 (6th Cir. 2011). This common sense principle stems from the need for supervisors to comment on the behavior of their employees. *Id*. It allows employers to discuss allegations, make appropriate inquiries, and commit findings to writing. *Id*. Without this privilege, "[h]ow else could one run a company?" *Id*.

So, too, in the business context, when the subject of the statement is not an employee, but a client or business partner. For example, in *Elias*, the Sixth Circuit held qualified privilege applied when the plaintiff, who owned a real-estate business, alleged that Freddie Mac defamed his business to three mortgage servicers. *Elias*, 581 F. App'x at 467. The privilege applied because Freddie Mac and its mortgage servicers shared a common business interest. *See id.* The applicability of qualified privilege in these circumstances is well-established. "Courts have consistently recognized this qualified privilege where the plaintiff and defendant have a 'common business interest.'" *Catrone v. Thoroughbred Racing Assoc. of North America, Inc.*, 727 F.Supp. 717, 724 (D. Mass. 1989) (citing cases); *see also Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 821 (11th Cir. 2011) (holding that statements by State Farm about a former insured to other State Farm insureds were privileged); *SDV/ACCI, Inc. v. AT&T Corp.*, 522 F.3d 955, 961 (9th Cir. 2008) (extending qualified privilege when an AT&T employee communicated statements about a former vendor to fellow employees); 53 C.J.S. Libel and Slander, Injurious Falsehood § 129 ("Defamatory matter is qualifiedly privileged when published between parties who have a common business interest in the subject matter of the communication, provided that the communication is made in good faith and without malice.").

This case is no different. Both Conley and the unknown speaker from Chase's Third Party Oversight Group shared a common business interest in mitigating reputational risk to Chase. The statement that Manni posed a "reputational risk" was made in furtherance of this common interest while evaluating Manni's relationship with Chase. Although the communication may have been made across two of Chase's branches–the Private Bank and the Mortgage Bank–these two branches (of the sole defendant) share a common interest that is, at a

minimum, as great as the interest shared by Freddie Mac and the three third-party mortgage servicers in *Elias*. *See* 581 F. App'x at 467 ("Freddie Mac and its mortgage services have a common interest in minimizing risk and fraud in their short-sale transactions[.]"). And there is no indication that the statement was published to anyone outside the company or that it was made in bad faith. Thus, the Court concludes that the statement to Conley was qualifiedly privileged.

This does not end the inquiry. Manni may overcome the privilege by showing the speaker "acted with actual malice, meaning with knowledge of the statement's falsity or with reckless disregard for the truth." *Elias*, 581 F. App'x at 467. He has not done so here, as the identity of the speaker remains unknown. Without the speaker's identity, it is impossible to discern whether the speaker had malice. And, in any event, malice is lacking because the statement reflects an actual occurrence, i.e., the Private Bank's decision to terminate its relationship with Manni because it believed he posed a reputational risk. Thus, because Manni cannot overcome Chase's qualified privilege, he cannot prevail on this defamation claim.

## B. Structuring Allegations

For the first time, in his response to Chase's Motion for Summary Judgment, Manni also raises a new defamation theory: that statements by Gruszczyk that he was structuring were defamatory. But a party may not assert a new theory in response to summary judgment. *See Bridgeport Music v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). Thus, the Court must first consider whether Manni's complaint sufficiently alleged this theory of defamation.

The parties dispute which pleading standard applies: the specificity requirement from Michigan law or the requirements of Rule 8 of the Federal Rules of Civil Procedure. *Compare*

*Cooley*, 833 N.W.2d at 341 ("A plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory.") *with State Farm Fire and Cas. Co. v. Allied and Assoc.*, 860 F.Supp.2d 432, 446-47 (E.D. Mich. 2012) (holding that a plaintiff bringing a defamation claim need only satisfy Rule 8 by pleading "sufficient factual matter").  Manni is correct; the Federal Rules of Civil Procedure govern this case and those rules do not require pleading defamatory statements with specificity.  *See Armstrong v. Shirvell*, 596 F. App'x 433, 459 (6th Cir. 2015).

But even under this more lenient standard, Manni's complaint is insufficient. It does not refer to any statements made by Gruszczyk nor does it contain a single allegation that any Chase employee made statements that Manni was structuring. Thus, the complaint lacks the factual content necessary to state a claim on this theory.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quotation marks omitted).  That Manni was unaware of the statements until discovery provides no recourse.  He could have sought to amend the complaint but did not.  *Tucker v. Union of Needletrades, Indus. and Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)."). The Court can decline to consider Manni's new defamation theory based on this alone.

What's more, even if the Court were to entertain this theory, it fails on the merits. Like the statement about Manni being a "reputational risk," any statements made by Gruszczyk or other Chase employees that Manni was structuring are protected by qualified privilege. These statements were made by Chase employees to Chase employees and concerned an shared

important common business interest–mitigating reputational risk.

Manni cannot overcome this privilege because he cannot show that any statements that he was structuring were made with actual malice. Again, this requires showing the speaker's knowledge of the statement's falsity or that the statements were made with reckless disregard of the truth. *Elias*, 581 F. App'x at 467. But Manni has not shown that Gruszczyk, or any other Chase employee, knew that the statements were false.

Nor can he show that the statements were made with a reckless disregard for the truth, that is, that Gruszczyk "made the statement with a high degree of awareness of probable falsity" or that she "entertained serious doubts as to the truth" of her publication. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 531 (6th Cir. 2014). Nothing in the record indicates that Gruszczyk "entertained serious doubts" about the truth of her statements that Manni was structuring. And Manni has not shown a question of material fact as to whether Gruszczyk had a "high degree of awareness of probable falsity." The record indicates that Chase employees would use "structuring" as a shorthand term for potential or apparent structuring. Gruszczyk, along with other Chase employees, was well aware of the concerns about structuring in Manni's accounts and, following a string of withdrawals under $10,000, initiated a review of his relationship with Chase. Any statements by her that Manni was structuring merely reflect the reality of his financial transactions. And although Manni has presented evidence, which he contends Chase erroneously failed to consider, to show that he was not structuring, Gruszczyk or Chase's failure to more thoroughly investigate whether Manni was in fact structuring does not suffice to show actual malice. *See Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 692 (1989). Nor has Manni shown that Gruszczyk or Chase purposefully avoided the truth. *See id*.

So, a reasonable jury could not conclude, based on the evidence presented, that Gruszczyk acted with actual malice.  Thus, because Manni cannot overcome qualified privilege, the Court shall grant Chase's Motion for Summary Judgment on his defamation claim.

## CONCLUSION

The Manni's family's displeasure with the abrupt dissolution of their long and fruitful banking and business relationships with Chase is understandable. But the claims they have brought require proofs that they have not provided.  Thus, the Court ORDERS that Chase's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 6, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 6, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager